UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

DANIEL N. ARBEENY, as the Administrator of
the Estate of NORMAN ARBEENY (deceased)
individually, Plaintiff SEAN S. NEWMAN, as the
Administrator of the Estates of MICHAEL J.
NEWMAN (deceased) and DOLORES D.
NEWMAN (deceased) individually, and on behalf
of others

                                    Plaintiffs,

                    v.

ANDREW M. CUOMO, MELISSA DEROSA,
HOWARD A. ZUCKER, M.D., GREATER NEW
YORK HOSPITAL ASSOCIATION, KENNETH
RASKE, NORTHWELL HEALTH, INC.,
MICHAEL DOWLING, AND JOHN DOES A-Z,

                                    Defendants.

---

**MEMORANDUM AND ORDER**

22-cv-02336 (LDH) (LB)

LASHANN DEARCY HALL, United States District Judge:

Daniel Arbeeny, as the Administrator of the Estate of Norman Arbeeny and Sean S. Newman, as the Administrator of the Estates of Michael J. Newman and Dolores D. Newman individually, and on behalf of others ("Plaintiffs"), bring the instant action against Andrew M. Cuomo, former Governor of New York, Melissa DeRosa, former Chief of Staff to Governor Cuomo, Dr. Howard A. Zucker, former Commissioner of the New York State Department of Health ("NYSDOH") (collectively, the "State Defendants"), Greater New York Hospital Association ("GNYHA"), Kenneth Raske, President and Chief Executive Officer of GNYHA (together, "GNYHA Defendants"), Northwell Health, Inc. ("Northwell"), Michael Dowling, President and Chief Executive Officer of Northwell (together, "Northwell Defendants") (together with GNYHA Defendants, the "Hospital Defendants"), and John Does A-Z, asserting claims pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1985 for deprivation of their constitutional rights and rights under the Federal Nursing Home Reform Act ("FNHRA"). Plaintiffs also assert a

wrongful death claim under New York Estate Powers & Trust Law ("NYEPT") § 5-4.1. Defendants each move pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss the complaint in its entirety.

## BACKGROUND

In March 2020, when a rise in COVID-19-related hospitalizations began to put a strain on New York State's healthcare infrastructure, state officials determined that there was an "urgent need" to expand hospital capacity to meet the demand for patients with COVID-19 requiring acute care. (*See* Glavin Decl. Supp. Cuomo's Mot. Dismiss ("Glavin Decl."), Ex. 1 ("NH Advisory") at 1, ECF No. 68-1.)[1]  Governor Cuomo directed hospitals to immediately increase bed capacity by at least 50%. (Second Am. Compl. ("SAC") ¶ 52.)  Kenneth Raske and Micheal Dowling, on behalf of GNYHA and Northwell respectively, spoke with Cuomo and his team on multiple occasions. (*Id*. ¶ 49.)  During those discussions, they urged Cuomo to issue policy on transfers of patients to nursing homes. (*Id*. ¶ 52.)  Among other things, Raske and Dowling indicated such policy was necessary because the hospitals couldn't afford to house recovered nursing-home residents long-term and models showed they soon "could be swamped." (*Id*. ¶ 52–53.)

On March 25, 2020, the NYSDOH issued an advisory to nursing homes (the "NH Advisory") directing that "[n]o resident shall be denied re-admission or admission to the [nursing home] solely based on a confirmed or suspected diagnosis of COVID-19" and that nursing homes were "prohibited from requiring a hospitalized resident who is determined medically stable, under the advisory, to be tested for COVID-19 prior to admission or readmission." (NH Advisory at 1.)

---

[1] In rendering its decision on the motions to dismiss, the Court has considered the NH Advisory, the ACF Advisory, and the NYSDOH Report, which were all attached to Defendant Cuomo's motion to dismiss and were incorporated by reference in the complaint. On a motion to dismiss, the Court "may consider documents that 'are attached to the complaint,' 'incorporated in it by reference,' 'integral' to the complaint, or the proper subject of judicial notice." *United States v. Strock*, 982 F.3d 51, 63 (2d Cir. 2020) (quoting *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007)).

Hospital discharge planners were to confirm that a resident was determined to be "medically stable for return" by a hospital physician and provide "[c]omprehensive discharge instructions" to the nursing homes prior to the transfer.  (*Id.*)  Nursing homes were expected to maintain standard precautions and make "environmental cleaning" a priority.  (*Id.*)  On April 7, 2020, the NYSDOH issued a similar advisory to adult care facilities (the "ACF Advisory"), prohibiting such facilities from denying admission and readmission to COVID-19-recovered residents.  (Glavin Decl., Ex. 2 ("ACF Advisory") at 1, ECF No. 68-2.)  The ACF Advisory further directed that "[a]ny denial of admission or re-admission must be based on the ACF's inability to provide the level of care required for the prospective resident, pursuant to the hospital's discharge instructions."  (*Id.*) According to the second amended complaint, as a result of the NH Advisory and the ACF Advisory (together, the "2020 Advisories"), over 9,000 COVID-19-positive residents were admitted to nursing homes and adult care facilities, and over 15,000 of their residents died from COVID-19. (SAC ¶¶ 75–76.)[2]  The 2020 Advisories were withdrawn on May 10, 2020.  (*Id.* ¶ 75.)

Plaintiffs are the children of decedents Norman Arbeeny, Michael J. Newman, and Dolores D. Newman (collectively, the "Decedents").  (SAC ¶¶ 1, 4, 7.)  The Decedents were residents of nursing homes and adult care facilities in the State of New York who died between March and April 2020 after contracting COVID-19 and after the NYSDOH issued the 2020 Advisories.  (*Id.* ¶¶ 1–2, 4–5, 7–8, 50.)

---

[2] On July 6, 2020, the NYSDOH issued a report, later revised on February 11, 2021, assessing the factors associated with COVID-19 infections and fatalities in nursing homes during the pandemic.  (Glavin Decl., Ex. 3 ("NYSDOH Report") at 1, ECF No. 68-3.)  The revised report concluded that approximately 6,326 COVID-19-positive residents were admitted to nursing homes and adult care facilities between March 25, 2020 and May 8, 2020, that there had been 6,432 COVID-19 fatalities in nursing homes as of June 26, 2020, and that the data did not support "[a] causal link between the admission policy and infections/fatalities."  (*Id.* at 4–5, 7.)  The report instead attributed these infections and fatalities to COVID-19 transmission from nursing home employees, with the rate of employee infections corresponding to the spread of COVID-19 throughout the most impacted regions in the state.  (*Id.* at 3.) Some state officials and media outlets reported that Cuomo, DeRosa, and the NYSDOH made a concerted effort to downplay the number of COVID-19 deaths in nursing homes and adult care facilities and failed to report "at least 4,100" additional fatalities from April 2020 to February 2021.  (SAC ¶¶ 130–39.)

Norman Arbeeny, aged 89, was admitted to Cobble Hill Health Center ("CHHC"), a nursing home in Brooklyn, New York on March 20, 2020. (*Id*. ¶¶ 20–23.) At some point before his release from CHHC on April 8, 2020, Mr. Arbeeny developed a low-grade fever. (*Id*. ¶¶ 25–26.) Upon Mr. Arbeeny's discharge from CHHC, Mr. Arbeeny was placed under 24-hour at-home nursing care. (*Id*. ¶ 27.) Mr. Arbeeny's symptoms began to worsen, and he was tested for COVID-19 on April 20, 2020. (*Id*. ¶ 29.) Mr. Arbeeny died the next day, on April 21, 2020. (*Id*. ¶ 30.) Later that day, test results indicated that Mr. Arbeeny was positive for COVID-19. (*Id*. ¶ 31.)

Michael J. Newman, aged 84, was admitted to Grandell Rehabilitation and Nursing Center ("GRNC"), a nursing home in Long Beach, New York, on February 7, 2020. (*Id*. ¶¶ 32, 35.) At the time of his admission Mr. Newman "was in declining health." (*Id*. ¶ 34.) On March 29, 2020, Mr. Newman developed a fever, and his lungs began to fill with fluid. (*Id*. ¶ 37.) Mr. Newman died that same day and was posthumously diagnosed with COVID-19. (*Id*.)

Dolores D. Newman, aged 78, was admitted to Long Island Living Center ("LILC"), an adult care facility in Long Island, New York, on December 26, 2019. (*Id*. ¶¶ 38, 41.) On April 10, 2020, Ms. Newman developed a cough and a headache, and had difficulty breathing. (*Id*. ¶ 43.) On April 11, 2020, Ms. Newman was transported to a hospital and diagnosed with COVID-19. (*Id*.) Ms. Newman died at the hospital on April 14, 2020. (*Id*. ¶ 44.)

## STANDARD OF REVIEW

A complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the alleged facts allow the court to draw a "reasonable inference" of a defendant's liability for the alleged misconduct. *Iqbal*, 556 U.S. at 678. While this standard requires more than a "sheer possibility"

of a defendant's liability, *id.*, "[i]t is not the [c]ourt's function to weigh the evidence that might be presented at trial" on a motion to dismiss. *Morris v. Northrop Grumman Corp.*, 37 F. Supp. 2d 556, 565 (E.D.N.Y. 1999). Instead, "the [c]ourt must merely determine whether the complaint itself is legally sufficient, and in doing so, it is well settled that the [c]ourt must accept the factual allegations of the complaint as true." *Id.* (internal citation omitted).

## DISCUSSION

### I.    THE HOSPITAL DEFENDANTS

#### A.  Section 1983 Claims

Plaintiffs raise Section 1983 and Section 1983 conspiracy claims against the Hospital Defendants. (SAC ¶¶ 171–235.) To state a claim under Section 1983, a plaintiff must plausibly allege that the conduct at issue was "committed by a person acting under color of state law" and that it "deprived a person of rights, privileges or immunities secured by the Constitution or laws of the United States." *Cornejo v. Bell*, 592 F.3d 121, 127 (2d. Cir. 2010) (citing *Pitchell v. Callan*, 13 F.3d 545, 547 (2d Cir. 1994)). "To support a claim against a private party on a [Section] 1983 conspiracy theory, a plaintiff must show (1) an agreement between a state actor and a private party; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Lee v. L. Off. of Kim & Bae, PC*, 530 F. App'x 9, 9–10 (2d Cir. 2013) (citing *Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 324–25 (2d Cir. 2002)). The Hospital Defendants argue that Plaintiffs' Section 1983 and Section 1983 conspiracy claims against them must be dismissed because Plaintiffs fail to plead that the Hospital Defendants, as private parties, were acting under the color of state law or that they acted in concert with the State Defendants to inflict an unconstitutional injury. (GNYHA Defs.' Mot.

Dismiss ("GNYHA Mot.") at 10–16, 23, ECF No. 74; Northwell Defs.' Mot. Dismiss ("Northwell Mot.") at 6–15, ECF No. 65.)  The Court agrees.

Acts of a private party can only serve to sustain a Section 1983 claim if the challenged action is "fairly attributable to the state" or if the non-state actor was a "'willful participant in joint activity' with the state or its agents."  *Logan v. Bennington Coll. Corp.*, 72 F.3d 1017, 1027 (2d Cir. 1995) ("[A] state action occurs where the challenged action of a private party is fairly attributable to the state.") (internal citation and quotations omitted); *Betts v. Shearman*, 751 F.3d 78, 84 (2d Cir. 2014) ("[A] private actor acts under color of state law when the private actor is a willful participant in joint activity with the State or its agents.") (internal citation and quotations omitted).  Otherwise, private conduct, no matter how wrongful, is not "under color of state law" and, as such, does not fall within the ambit of a Section 1983 claim.  *Am. Mfrs. Mut. Ins. v. Sullivan*, 526 U.S. 40, 50 (1999).

Plaintiffs do not dispute that the Hospital Defendants are private entities whose actions cannot be attributable to the state.  Instead, Plaintiffs argue that the Hospital Defendants acted under color of state law because they actively participated, or conspired to participate, in the issuance of the 2020 Advisories, alongside the State Defendants.  (Pl.'s Opp'n Hospital Defs.' Mot. Dismiss ("Pl.'s Hospital Defs.' Opp'n") at 4–13, ECF No. 79.)

Although a Section 1983 conspiracy claim is distinct from one of joint action, courts in this circuit typically conduct the same analysis in evaluating these claims.  *See Betts*, 751 F.3d 78, 84 n.1 (2d Cir. 2014) ("A Section 1983 conspiracy claim is distinct from one of joint action."); *Ciambriello*, 292 F.3d at 324–25 (holding that the analysis of the plaintiff's Section 1983 conspiracy claim "is very similar to the analysis performed" for the Section 1983 claim and upholding the dismissal of both claims for the same reasons); *see also Lee,* 530 F. App'x at 9–10

(applying the same analysis to evaluate whether the plaintiff sufficiently alleged joint action or conspiracy by a private party under Section 1983); *Spear v. Town of W. Hartford*, 954 F.2d 63, 68 (2d Cir. 1992) (same); *Rice v. City of New York*, 275 F. Supp. 3d 395, 403 (E.D.N.Y. 2017) ("Although a Section 1983 conspiracy claim is distinct from one of joint action the concepts of acting 'jointly' or in 'conspiracy with' state actors are intertwined.") (internal citations and quotations omitted)*; Stewart v. Victoria's Secret Stores, LLC*, 851 F. Supp. 2d 442, 445 (E.D.N.Y. 2012) (The concepts of acting "jointly" or in "conspiracy with" state actors are intertwined . . . Even if considered as conceptually separate theories, both require the pleading of facts sufficient to show something more than conclusory allegations.)  That is, to sufficiently plead either joint activity or conspiracy with state actors, a plaintiff must allege specific facts that set forth a plausible theory of agreement and concerted action between the private party and the state actor. *See Stewart*, 851 F. Supp. 2d at 445.  Thus, a complaint must allege facts demonstrating that the private party and the state actor "share[d] some common goal to violate the plaintiff's rights" and "that the private entity acted in concert with the state actor to commit an unconstitutional act." *Betts*, 751 F.3d at 84-85 (quoting *Spear*, 954 F.2d at 68) (internal quotations omitted).  To support their claims, Plaintiffs direct the Court to eleven allegations that Plaintiffs contend sufficiently plead concerted action between the Hospital Defendants and the State Defendants. (Pl.'s Hospital Defs.' Opp'n at 5–7.)  They do not.

*First*, Plaintiffs direct the Court to the purported allegations that in "early 2020," Defendant Cuomo appointed Defendant Dowling to head the Medicaid Redesign Team and, at the same time, Defendant Raske was serving as a "member of the state commission."[3]  (*Id*. at 5.) As a threshold matter, Plaintiffs failed to raise these allegations in their Second Amended

---

[3] Plaintiffs fail to specify the "state commission" of which Raske is alleged to be a member.

Complaint and, as such, the Court need not consider them. *Peacock v. Suffolk Bus Corp.*, 100 F. Supp. 3d 225, 231 (E.D.N.Y. 2015) ("It is well-settled that a plaintiff cannot amend his complaint by asserting new facts or theories for the first time in opposition to a motion to dismiss . . . Such claims are not properly before the Court and the Court need not consider them." (internal citations and alterations omitted)). Nonetheless, these allegations cannot support an inference of concerted action to violate the Decedents' constitutional rights. That is, Plaintiffs do not allege that the Medicaid Redesign Team or the "state commission" were involved in the issuance of the 2020 Advisories. And, allegations of conduct that is unrelated to the state's alleged unlawful actions cannot support Section 1983 claims against a private party. *See Hollman v. Cnty. of Suffolk*, No. 06-CV-3589, 2011 WL 2446428, at *6 (E.D.N.Y. June 15, 2011) ("[A]ctivities [that] are wholly unrelated to the alleged injury at issue in the instant case . . . are inapplicable to the state action analysis.")

*Second*, Plaintiffs point to allegations that, throughout March and April 2020, Defendant Cuomo's schedule reflected 228 meetings or calls "with the hospital lobby" and that, in the month leading up to the issuance of the NH Advisory, and shortly thereafter, Defendants Raske and Dowling met with Cuomo on several occasions. (Pls.' Hospital Defs. Opp'n at 5–6.) Notably, Plaintiffs do not allege that any of the 228 meetings and calls between Cuomo and the Hospital Defendants were related to the issuance of the 2020 Advisories. Of course, "[a]lleging merely that a private party regularly interacts with a state actor does not create an inference of agreement to violate a plaintiff's rights." *Morpurgo v. Inc. Vill. of Sag Harbor*, 697 F. Supp. 2d 309, 338 (E.D.N.Y. 2010), *aff'd,* 417 F. App'x 96 (2d Cir. 2011) (internal citations and quotations omitted). Without more, the fact that the Hospital Defendants and Cuomo communicated regularly around the time that the 2020 Advisories were issued is insufficient to

plead that they were acting in concert with the State Defendants.  *See Bryant v. Steele*, 93 F. Supp. 3d 80, 91–92 (E.D.N.Y. 2015) (citing *Fisk v. Letterman*, 401 F. Supp. 2d 362, 377 (S.D.N.Y. 2005)) ("[M]ere '[c]ommunications,' even regular ones, 'between a private and a state actor, without facts supporting a concerted effort or plan between the parties, are insufficient to make the private party a state actor.'").

*Third*, Plaintiffs highlight allegations regarding the influence of the hospital lobby on the Cuomo administration and its health policy.  (Pls.' Hospital Defs. Opp'n at 5–6.)  For example, Plaintiffs point to allegations that the hospital lobby donated significant sums to Cuomo's campaign and successfully advocated for legislation benefitting health care facilities.  (*Id.*) Plaintiffs also direct the Court to news reports that the "hospital lobby was pleading with Cuomo to issue policy on transfers to nursing homes" and that Defendant Raske "contacted Mr. Cuomo's team for help with nursing homes" days before Cuomo's approval of the NH Advisory. (*Id.*)  These allegations at most suggest that the Hospital Defendants solicited the State Defendants to issue the 2020 Advisories through lobbying efforts.  However, mere solicitation of state actors without participation in state activity does not amount to concerted action.  *See Sherman v. City of New York*, No. 18-CV-5359, 2019 WL 2164081, at *6 (E.D.N.Y. May 16, 2019) ("A private party does not act under color of law when he merely elicits but does not join in an exercise of official state authority.") (quoting *Serbalik v. Gray*, 27 F. Supp. 2d 127, 131–32 (N.D.N.Y. 1998)) (internal quotations and alterations omitted); *see also Missere v. Gross*, 826 F. Supp. 2d 542, 567–68 (S.D.N.Y. 2011) (holding that lobbying and pressuring officials to take action was not sufficient to establish that a private party was a state actor).  Where a state actor "exercises independent judgment in how to respond to a private party's legitimate request for assistance, the private party is not 'jointly engaged' in the [official's] conduct."  *Ginsberg v.*

*Healey Car & Truck Leasing, Inc.*, 189 F.3d 268, 272–73 (2d Cir. 1999) (internal citation omitted) (holding that "Section 1983 does not impose civil liability on persons who merely stand to benefit from an assertion of authority under color of law.").

*Fourth*, Plaintiffs point to allegations that, after the 2020 Advisories were withdrawn, Cuomo enlisted Dowling, Raske, and two other individuals to provide a report on the impact of the 2020 Advisories on nursing homes, and that Cuomo endorsed a book written by Defendant Dowling about the pandemic. (Pls.' Hospital Defs.' Opp'n at 5–6.) However, like the allegations regarding Dowling's appointment to the Medicaid Redesign Team and Raske's involvement in the "state commission," these allegations are untethered to the wrongful conduct alleged in this case. Indeed, Plaintiffs make no effort to tie Dowling's book, or Cuomo's endorsement of it, to the issuance of the 2020 Advisories. Instead, Plaintiffs curiously rely on conduct that post-dates the issuance and withdrawal of the 2020 Advisories in an effort to convince the Court that the Hospital Defendants acted in concert with the State Defendants. (*See id*.) It does not. It is axiomatic that conduct post-dating the alleged constitutional violation cannot support an inference that a defendant acted in concert with state officials or jointly participated in said violation.

**B.  Section 1985 Claim**

Plaintiffs' Section 1985 claim fares no better. To support a conspiracy claim pursuant to Section 1985, Plaintiffs must allege: "(1) a conspiracy (2) for the purpose of depriving a person or class of persons of the equal protection of the laws, or the equal privileges and immunities under the laws; (3) an overt act in furtherance of the conspiracy; and (4) an injury to the plaintiff's person or property, or a deprivation of a right or privilege of a citizen of the United States." *Gray v. Town of Darien,* 927 F.2d 69, 73 (2d Cir. 1991). Importantly, to make out a

Section 1985 claim Plaintiffs must plead that the alleged conspiracy was motivated by "some racial, or perhaps otherwise class-based, invidious discriminatory animus." *United Bhd. of Carpenters & Joiners of Am., Loc. 610, AFL-CIO v. Scott*, 463 U.S. 825, 835 (1983). Here, Plaintiffs do not make any allegations that would support an inference that any Defendant was motivated by discriminatory animus toward elderly individuals. Plaintiffs do not allege that the Defendants "selected their course of action because of" the Decedents' age. *See Thomas v. Roach*, 165 F.3d 137, 147 (2d Cir. 1999). Nor do Plaintiffs refer to any statements made by the Defendants that would suggest that their actions were motivated by the Decedents' age. *See Khan v. City of New York*, No. 14-CV-4665, 2016 WL 1128298, at *7 (E.D.N.Y. Feb. 1, 2016), *report and recommendation adopted,* No. 14-CV-4665, 2016 WL 1192667 (E.D.N.Y. Mar. 21, 2016). In fact, Plaintiffs' allegations suggest that the whatever motivation that the Hospital Defendants had was "financial, not discriminatory," which is insufficient to support a Section 1985 conspiracy claim. *See Doe v. Fenchel*, 837 F. App'x 67, 69 n.2 (2d Cir. 2021). Indeed, Plaintiffs allege that the Defendants' actions were "financially motivated at their core" and that their "real motivation" for soliciting the issuance of the 2020 Advisories was the fact that hospitals were paid significantly more under Medicare for patients with COVID-19 than those without. (*See* SAC ¶ 97, 176; *see also* ¶¶ 95–96, 131, 225.) Accordingly, Plaintiffs' Section 1985 claims against the Defendants must be dismissed. *See Panchitkhaew v. Cuomo*, No. 19-CV-6206, 2024 WL 1347518, at *3 (E.D.N.Y. Mar. 29, 2024) (dismissing Section 1985 claim where Plaintiffs failed to assert any allegation that might support an inference that Defendants conspired to deprive a protected class of any specified constitutional rights).

11

## II.     THE STATE DEFENDANTS

Plaintiffs' remaining Section 1983 claims against the State Defendants are precluded by the doctrine of qualified immunity.  Qualified immunity shields government officials performing discretionary functions from suits for money damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  The doctrine is intended to "give[] government officials breathing room to make reasonable but mistaken judgments" and "protect[] all but the plainly incompetent or those who knowingly violate the law."  *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (citing *Malley v. Briggs*, 475 U.S. 335, 335 (1986)) (internal quotations omitted).  As such, state officials are entitled to qualified immunity under Section 1983 unless "(1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'"  *D.C. v. Wesby*, 583 U.S. 48, 62–63 (2018) (quoting *Reichle v. Howards,* 566 U.S. 658, 664 (2012)). [4]

In evaluating whether to grant qualified immunity, courts have historically first assessed whether the state actor violated a federal statutory or constitutional right before determining whether that right was clearly established at the time of the official's alleged misconduct. *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  This protocol, known as the "*Saucier* protocol," was born out of the Supreme Court's 2001 decision in *Saucier v. Katz*, which expressly held that, for courts conducting a qualified immunity analysis, the question of whether a plaintiff alleged that an official's conduct violated a constitutional right "must be the initial inquiry."  *See id*.  The

---

[4] "[Q]ualified immunity is 'an immunity from suit rather than a mere defense to liability [and] it is effectively lost if a case is erroneously permitted to go to trial.'"  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).  As such, the availability of qualified immunity should be decided by a court "[a]t the earliest possible stage in litigation."  *Hunter v. Bryant*, 502 U.S. 224, 227 (1991); *see also Pearson*, 555 U.S. at 231–32 ("[T]he driving force behind creation of the qualified immunity doctrine was a desire to ensure that insubstantial claims against government officials will be resolved prior to discovery." (internal citations and quotations omitted)).

Court in *Saucier* reasoned that "[i]n the course of determining whether a constitutional right was violated on the premises alleged, a court might find it necessary to set forth principles which will become the basis for a holding that a right is clearly established." *Id*. This explication of legal principles necessarily facilitates the elaboration of the law from case to case. *Id*.

Some eight years after *Saucier*, the Supreme Court opened the door for courts to depart from its protocol. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009). That is, in *Pearson v. Callahan*, the Supreme Court concluded that a court need not first determine whether an official's actions violated a statutory or constitutional right in order to find that the qualified immunity doctrine applies. *See id*. Instead, according to the Court, "[t]he judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id*.; *see also Liberian Cmty. Ass'n of Conn. v. Lamont*, 970 F.3d 174, 186 (2d Cir. 2020) ("[A] court need not determine whether a defendant violated a plaintiff's rights if it decides that the right was not clearly established."). Such latitude avoids, what is in some cases, "an essentially academic exercise" where the resolution of the constitutional question is not necessary to find that qualified immunity applies. *See Pearson*, 555 U.S. at 237–38. This is particularly so when (1) "it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right," (2) "the constitutional question is so factbound that the decision provides little guidance for future cases," (3) "[a] decision on the underlying constitutional question in a Section 1983 damages action . . . may have scant value when it appears that the question will soon be decided by a higher court," (4) "resolution of the constitutional question requires clarification of an ambiguous state statute," (5) at the pleading stage, "the precise factual basis for the plaintiff's

claim or claims may be hard to identify" and thus "the answer to whether there was a violation may depend on a kaleidoscope of facts not yet fully developed," (6) "the briefing of constitutional questions is woefully inadequate" which creates a "risk that constitutional questions may be prematurely and incorrectly decided in cases where they are not well presented," or (7) "a court [can] rather quickly and easily decide that there was no violation of clearly established law before turning to the more difficult question [of] whether the relevant facts make out a constitutional question at all."  *See id*. at 237–40 (citations and quotations omitted).

Admittedly, this Court has not previously accepted the Supreme Court's invitation to bypass the inquiry into whether challenged conduct violates a federal statutory or constitutional right.  The reason for this is consistent with the reasoning articulated by the Supreme Court in *Saucier*.  Inquiry into whether a statutory or constitutional right has been violated is necessary to clearly establish the law that will serve to protect against potential future abuses by state actors. *Saucier*, 533 U.S. at 201 (holding that "[t]he law might be deprived of [the elaboration of a clearly established right] were a court simply to skip ahead to the question whether the law clearly established that the officer's conduct was unlawful in the circumstances of the case."). As such, in this Court's opinion, it is only in the exceptional case where the *Saucier* protocol should be abandoned in favor of the one articulated in *Pearson*.  This is such a case. Accordingly, the Court's inquiry here begins with whether Plaintiffs' claimed constitutional rights and statutory rights under the FNHRA were clearly established when the 2020 Advisories were issued.

"A right is 'clearly established' when 'the contours of the right are sufficiently clear that a reasonable official would understand that what they are doing violates that right.'" *Soukaneh*

14

*v. Andrzejewski*, 112 F.4th 107, 116 (2d Cir. 2024) (quoting *Jackler v. Byrne*, 658 F.3d 225, 242 (2d Cir. 2011)) (alterations omitted). Put another way, "'existing precedent must have placed the statutory or constitutional question *beyond debate*.'" *Liberian Cmty.*, 970 F.3d at 186–87 (quoting *White v. Pauly*, 580 U.S. 73 (2017)) (emphasis in original). Where "reasonable officers could disagree on the legality of the action at issue in its particular factual context," under then-existing legal precedent, qualified immunity should be granted. *Soukaneh*, 112 F.4th at 116 (quoting *Guan v. City of New York*, 37 F.4th 797, 806 (2d Cir. 2022)); *see also Wesby*, 583 U.S. at 63 (2018) ("'Clearly established' means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." (internal citations and quotations omitted)); *Southerland v. City of New York*, 680 F.3d 127, 141 (2d Cir. 2012) ("[E]ven where the law is 'clearly established' . . . the qualified immunity defense [] protects an official if it was 'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful." (quoting *Taravella v. Town of Wolcott*, 599 F.3d 129, 134 (2d Cir. 2010))); *Walczyk v. Rio,* 496 F.3d 139, 166 (2d Cir. 2007) (Sotomayor, J., concurring) ("[W]hether a right is clearly established is *the same question* as whether a reasonable officer would have known that the conduct in question was unlawful." (emphasis in original)).

Of particular relevance here, the Supreme Court has repeatedly instructed courts "not to define clearly established law at a high level of generality." *al-Kidd*, 563 U.S. at 742. As such, to sufficiently plead that a right was clearly established, "[a] plaintiff must show with a high degree of specificity, that the rule he seeks to apply prohibited the officer's conduct." *Liberian Cmty.*, 970 F.3d at 186–87 (citing *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)) (internal quotations omitted); *see also Mara v. Rilling*, 921 F.3d 48, 68–69 (2d Cir. 2019) ("[T]he law must be so

clearly established with respect to the *particular* conduct and the specific context at issue that every reasonable official would have understood that his conduct was unlawful." (emphasis in original) (internal citations and quotations omitted)); *Reichle*, 566 U.S. at 665 ("[W]e have previously explained that the right allegedly violated must be established, not as a broad general proposition, but in a particularized sense so that the contours of the right are clear to a reasonable official." (internal citations and quotations omitted)).  Although this standard does not require a plaintiff to allege that there is a case directly on point with their alleged facts, "controlling authority or a robust consensus of cases of persuasive authority" dictate whether a right is clearly established.  *Liberian Cmty.*, 970 F.3d at 186 (internal citations and quotations omitted); *see also Soukaneh*, 112 F.4th at 122 ("The analysis under this element 'turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken.'" (quoting *Colvin v. Keen*, 900 F.3d 63, 75 (2d Cir. 2018)); *Matusick v. Erie Cnty. Water Auth.*, 757 F.3d 31, 60 (2d Cir. 2014) ("The salient question [] is whether the case law at the time in question would have put reasonable officers on fair warning that their conduct violated the plaintiff's rights." (internal citation and quotations omitted)). [5]

Here, Plaintiffs allege that the State Defendants, in issuing the 2020 COVID Advisories,

---

[5] Courts routinely find that readily distinguishable cases cannot serve as a basis to find that a right was clearly established in a separate context.  For example, in *Radwan v. Manuel*, a student who played soccer for the University of Connecticut brought claims against the school for violating her First Amendment rights when they terminated her scholarship in response to her raising her middle finger to a television camera after the team won a tournament.  55 F.4th 101, 118 (2d Cir. 2022).  The student argued that it was clearly established that showing the middle finger, even if offensive, expresses a viewpoint and that punishing her for expressing a viewpoint violated her First Amendment rights.  *Id.*  To support her argument, the student relied on a case, *Papish v. Board of Curators of the Univ. of Mo.*, 410 U.S. 667 (1973), where the Supreme Court held that a university violated a student's First Amendment right to free speech when it expelled the student after she published "indecent" content in her independent newspaper.  *Id.*  The Second Circuit in *Radwan* rejected the plaintiff's argument, holding that "[e]xpelling a university student because of a disagreement with the content of an article in an independent student newspaper . . . is not the constitutional equivalent of disciplining a university student for displaying a vulgar or offensive gesture while playing for a university's sports team."  *Id.*  The court found that, because the plaintiff's situation differed from the context of the previous case, the plaintiff failed to plead that her free speech rights, in the context of her involvement in a school-sponsored event, were clearly established at the time.  *Id.* at 118–20.

violated Decedents' statutory rights under the FNHRA and certain constitutional rights.  (SAC ¶ 181.)  The State Defendants argue that they are immune from Section 1983 liability because these rights were not clearly established such that reasonable officials would have found the 2020 Advisories to be unlawful at the time that they were issued.  (*See* Cuomo Mot. to Dismiss ("Cuomo MTD") at 17–22, ECF No. 67; DeRosa Mot. to Dismiss ("DeRosa MTD") at 18–20, ECF No. 72-1; Zucker Mot. to Dismiss ("Zucker MTD") at 20–23, ECF No. 70.)  The Court agrees with the State Defendants.

### A.  Rights Under the FNHRA

The FNHRA was enacted to protect the health, safety, and dignity of residents in nursing facilities that receive Medicaid funding.  *See* 42 U.S.C.A. § 1396r; 42 C.F.R. § 483.10.  Under the FNHRA, "[a] nursing facility must protect and promote the rights of each resident," which includes rights to choose their physician and to participate in planning their treatments, be free from restraints and abuse, retain privacy and confidentiality, receive reasonable accommodations, voice grievances, organize groups and participate in activities, and refuse transfers, among others.  42 U.S.C.A. § 1396r(c)(A)(i)–(xi); 42 C.F.R. § 483.10 (enumerating additional resident rights).  Therefore, according to Plaintiffs, the FNHRA "unambiguously confers a multitude of rights upon Plaintiffs" and the "plain statutory language of the FNHRA renders those rights as clearly established for the purposes of defeating qualified immunity."  (Pls.' Opp'n to State Defs.' Mots. to Dismiss ("Pls.' State Defs. Opp'n") at 16–17, ECF No. 76.)[6]

---

[6] In full, Plaintiffs allege that under the FNHRA, Decedents had clearly established rights to "be cared for in such a manner and in such an environment as will promote quality of life;" "receive nursing and related services and specialized rehabilitative services so as to attain and maintain the highest practicable physical, mental, and psychosocial well-being;" "be cared for in such a manner so as to attain and maintain the highest practicable physical, mental, and psychosocial wellbeing;" " reside in a safe, sanitary, and comfortable environment designed to prevent the development of disease and infection;" "reside in a facility designed, constructed, equipped, and maintained in a manner to protect the health and safety of residents, personnel, and the general public;" "be treated

17

In support of their argument, Plaintiffs rely on the Supreme Court's 2023 holding in *Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166 (2023).  In *Talevski*, the plaintiff brought a Section 1983 claim against a county-run nursing facility on behalf of a deceased resident who had been chemically restrained with medications that exacerbated his dementia and was then transferred to another facility 90 minutes away without notification to his family and without the facility satisfying necessary preconditions.  *Id.* at 171–73.  The plaintiff alleged that the nursing home's treatment of the decedent violated his rights under the FNHRA to be free from unnecessary physical or chemical restraints and to be discharged or transferred only when certain preconditions are satisfied.  *Id.*  Ultimately, the Supreme Court held that the plaintiff was permitted to bring a Section 1983 claim against the nursing home because the FNHRA confers individually enforceable rights on nursing home residents.  *Id.* at 180.

Plaintiffs' reliance on *Talevski* is misplaced.  Prior to the Supreme Court's ruling in *Talevski*, courts around the country, and within the Second Circuit, were split as to whether the FNHRA conferred a private right of action enforceable under Section 1983.  *See, e.g. Mauro v. Cuomo*, No. 21-CV-1165, 2023 WL 2403482, at *3 (E.D.N.Y. Mar. 8, 2023) ("Courts in [the Second] Circuit are split as to whether the FNHRA creates a private right of action.") (collecting cases); *Boykin v. 1 Prospect Park ALF, LLC*, 993 F. Supp. 2d 264, 281 (E.D.N.Y. 2014) ("The federal courts are split as to whether various provisions of FNHRA confer individual rights that are enforceable through section 1983 for Medicaid beneficiaries who reside at substandard, state-run nursing homes.") (collecting cases).  This disagreement at the time of the issuance of the

---

with dignity and care in a manner and in an environment that promotes maintenance or enhancement of their quality of life, recognizing their individuality, and with their rights protected and promoted;" "be treated with respect and dignity;" "make choices about aspects of their life that are/were significant to them;" "receive the necessary care and services in such a manner so as to attain and maintain the highest practicable physical, mental, and psychosocial well-being;" and "reside in a safe, sanitary, and comfortable environment designed to prevent the development of diseases and infections."  (SAC ¶ 56.)

2020 Advisories forecloses a finding that a reasonable officer would have known that the issuance of the advisories would violate residents' rights under the FNHRA. Or, as put by the Supreme Court, "[i]f judges [] disagree on a constitutional question, it is unfair to subject [officials] to money damages for picking the losing side of the controversy." *Reichle*, 566 U.S. at 670 (citing *Wilson v. Layne,* 526 U.S. 603, 618 (1999)).

Even more damning to Plaintiffs argument is the timing of the issuance of the *Talevski* opinion. That is, *Talevski* was decided in 2023—three years after the 2020 Advisories were issued in this case. It is axiomatic that for a case to provide the basis to claim that the law articulated therein was clearly established to defeat a claim of qualified immunity, the case must predate the conduct at issue. Where there are no existing court decisions that would give an official fair warning that such conduct was proscribed by law, there can be no clearly established right. *See Matusick*, 757 F.3d at 61 (holding that there was no clearly established right where, at the time of officers' alleged constitutional violation of the right to intimate association, "the nature and the extent of the right [were] hardly clear," "the source of the intimate association right ha[d] not been authoritatively determined," and there were no court decisions that would have provided fair warning to a reasonable officer at the time that the right to intimate association would extend to the plaintiff's relationship).

In any event, *Talevski* is plainly distinguishable. In *Talevski*, the Supreme Court noted that the case was about "particular provisions" of the FNHRA referring to the rights of nursing-home residents "to be free from unnecessary physical or chemical restraints and to be discharged or transferred only when certain preconditions are satisfied" and "whether nursing-home residents can seek to vindicate those FNHRA rights in court." *See Talevski*, 599 U.S. at 171; 42 U.S.C. § 1396r(a). Here, Plaintiffs bring claims against state officials for the issuance of public

19

health regulations governing the admission of residents to nursing homes and adult care facilities in the midst of an unprecedented global pandemic. *Talevski* does not contemplate the circumstances presented by the instant case. In other words, *Taleveski* did not place the statutory or constitutional questions raised in this case beyond debate. *See al-Kidd*, 563 U.S. at 741 (finding that to be deemed clearly established "existing precedent must have placed the statutory or constitutional question beyond debate.") At most, *Talevski* stands for a general proposition that the FNHRA confers a private right of action, which can be enforced against state-run nursing facilities under Section 1983. This broad proposition is insufficient to support a finding that the Decedents' rights under the FNHRA were clearly established with respect to public health regulations imposed by the state. *See Mullenix*, 577 U.S. at 12 (finding that inquiry into whether law is clearly established "must be undertaken in light of the specific context of the case, not as a broad general proposition.").

## B. Constitutional Rights

Plaintiffs argue that the Decedents had clearly established rights to "[freedom] from cruel, unhuman, or degrading treatment," "safe conditions," "life," "bodily integrity," and "[freedom] from state-created danger," such that any reasonable official would have known that the issuance of the 2020 Advisories would violate these rights. (Pl.'s State Def.'s Opp'n at 17–22; SAC ¶ 181.) None of Plaintiffs arguments operate to defeat qualified immunity here.

Plaintiffs maintain that the Decedents' right to be free from cruel, unhuman, or degrading treatment, as a "universally accepted customary human rights norm" was clearly established at the time the State Defendants issued the 2020 Advisories. (Pls.' State Defs.' Opp'n at 17.) In support, Plaintiffs direct the Court to non-controlling case law pertaining to claims brought under the Foreign Sovereign Immunities Act ("FSIA"), the Torture Victim Protection Act ("TVPA"),

20

and the Alien Tort Claims Act ("ATCA").  (*Id*.)  Of course, none of these statutes are implicated by the claims in this case.  Plaintiffs point to *Abebe–Jira v. Negredo*, where a plaintiff brought a claim under the ATCA against her captor and torturer, who was associated with the mid-1970s military dictatorship in Ethiopia, for torture and cruel, inhuman, and degrading treatment.  72 F.3d 844 (11th Cir. 1996), *cert. denied*, 519 U.S. 830 (1996).  Plaintiffs also cite *Najarro de Sanchez v. Banco Central de Nicaragua*, where an émigré from Nicaragua who fled the country to escape the Sandinista regime, brought a claim under the FSIA against the Nicaraguan Central Bank to cash a check that was issued to her prior to the demise of the former regime.  770 F.2d 1385 (5th Cir. 1985).  Moreover, Plaintiffs cite to *Xuncax v. Gramajo*, where Guatemalan immigrants brought claims under the FSIA, TVPA, and ATCA against the former Guatemalan Minister of Defense for the execution and disappearance of plaintiffs' relatives, torture, arbitrary detention, and cruel, inhuman and degrading treatment.  886 F. Supp. 162 (D.Mass. 1995).  Lastly, Plaintiffs cite to *Paul v. Avril*, where Haitian citizens brought claims under the ATCA against the ruler of a military regime in Haiti for torture and false imprisonment.  901 F. Supp. 330 (S.D.Fla. 1994).

These cases are patently distinguishable from the instant matter.  In each case, one or more plaintiffs claimed to have been subjected to torture, murder, kidnapping and the like from Defendants.  Here, the conduct at issue, while serious, is of a different sort.  Plaintiffs in this case complain that Defendants issued public health advisories pertaining to the admission of COVID-19-recovered residents into nursing homes and adult care facilities, which, once adhered to, led to the untimely deaths of nursing home residents.  (*See generally*, SAC.)  Even if Plaintiffs were able to demonstrate a broad, general right to be free from cruel, unhuman, and degrading

treatment, such readily distinguishable cases cannot serve as a basis to find that such right was clearly established as it relates to the conduct alleged here.  *See Mullenix*, 577 U.S. at 12.

Moreover, to the extent that Plaintiffs allude to the constitutional right to be free from cruel and unusual punishment conferred by the Eighth Amendment to support their argument, it is unhelpful to them.  (*See* Pl.'s State Defs.' Opp'n at 17.)  It is well-settled that constitutional protections under the Eighth Amendment are only applicable to individuals who have been convicted of a crime.  *See Ingraham v. Wright*, 430 U.S. 651, 668–69 (1977) (holding that the Eighth Amendment's prohibition of cruel and unusual punishments is limited to "criminal punishments" and is not applicable outside of that context).  As such, because the nursing home residents were not under criminal punishment, they did not have a clearly established right under the Eighth Amendment.

Plaintiffs further argue that the issuance of the 2020 Advisories violated clearly established substantive due process rights under the Fifth and Fourteenth Amendments—specifically the right to safe conditions, life, bodily integrity, and freedom from state-created danger.  (Pls.' State Defs.' Opp'n at 17–22.)  Here, again, Plaintiffs fail to cite to any case similar in fact to the one at hand that would demonstrate, beyond debate, that these due process rights were clearly established in the context of public health policy decisions at the time of the issuance of the 2020 Advisories.  Indeed, they could not have.

The Second Circuit has explicitly noted that "the Supreme Court has not addressed the limits imposed by due process on a [s]tate's power to manage infectious diseases."  *Liberian Cmty.*, 970 F.3d at 190.  State officials were tasked with acting quickly in response to evolving and dynamic circumstances during the COVID-19 pandemic.  As such, courts in this circuit and across the country have routinely granted state officials qualified immunity for policies

implemented in response to the ongoing public health crisis. *See, e.g.*, *Mauro*, 2023 WL 2403482, at *6 (collecting cases); *Liner v. Hochul*, No. 21-CV-11116, 2023 WL 358826, at *5 (S.D.N.Y. Jan. 23, 2023). And as the Second Circuit has made clear, "the very purpose of qualified immunity is to protect officials when their jobs require them to make difficult on-the-job decisions . . . [t]his is especially true when officials are forced to act quickly, such as in the context of a public health emergency." *DiBlasio v. Novello*, 413 F. App'x 352, 356 (2d Cir. 2011) (citation and quotations omitted). Even the Supreme Court has weighed in to conclude that state officials must be given "especially broad" latitude to act "in areas fraught with medical and scientific uncertainties," and generally "should not be subject to second-guessing by an unelected federal judiciary, which lacks the background, competence, and expertise to assess public health and is not accountable to the people." *South Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613–14 (2020) (Roberts, C.J., concurring in the judgment denying temporary injunction) (internal citations and quotations omitted). All of these considerations are at play in this case. In fact, the Court need look no further than the Plaintiffs' own complaint. According to the complaint, Defendants were motivated to issue the 2020 Advisories, at least in part, by the concern that New York State hospitals would become "swamped" with COVID-19 patients and could not afford to house recovered nursing-home residents long-term. (*See* SAC ¶ 53.)

Plaintiffs' claims against the State Defendants are precluded by the doctrine of qualified immunity. Accordingly, Plaintiffs' Section 1983 and Section 1985 claims against the State Defendants must be dismissed.

### III.    WRONGFUL DEATH CLAIM

Having concluded that Plaintiffs failed to state any federal claims, it is within the Court's discretion not to exercise pendent jurisdiction over the state law claims.   *See Valencia ex rel. Franco v. Lee*, 316 F.3d 299, 305 (2d Cir. 2003) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims."); *see also Jones v. Cnty. of Suffolk*, 236 F. Supp. 3d 688, 702 (E.D.N.Y. 2017); *Eubanks v. Hansell*, No. 22-CV-6277, 2024 WL 1308672, at *12 (E.D.N.Y. Mar. 26, 2024) ("[B]ecause Plaintiffs have failed to allege a viable federal claim, it would 'exceed [the] allowable discretion' of the Court to assert supplemental jurisdiction.").  As such, the Court declines to exercise jurisdiction over Plaintiffs' wrongful death claim and it must be dismissed for lack of subject matter jurisdiction.

### CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss are GRANTED and Plaintiffs' complaint is DISMISSED.


SO ORDERED.


Dated: Brooklyn, New York                    /s/ LDH_____
       January 10, 2025                     LaSHANN DeARCY HALL
                              United States District Judge